IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IAN EVANS, :
    Plaintiff, : CIVIL ACTION
:
v. :
:
COMMISSIONER OF THE SOCIAL : No. 18-4059
SECURITY ADMINISTRATION, :
    Defendant. :

## MEMORANDUM OPINION

**Timothy R. Rice**                                                                       **March 25, 2019**
**U.S. Magistrate Judge**

      Plaintiff Ian Evans, age 36, suffers from the following severe impairments: migraine headaches, affective disorder, and anxiety disorder. R. at 17. He argues the Administrative Law Judge (ALJ) erred in denying his applications for Disability Insurance Benefits and Supplemental Security Income by improperly: (1) discrediting his allegations; (2) finding he did not meet a Listing;[1] (3) assessing his Residual Functional Capacity (RFC);[2] and (4) failing to provide substantial evidence in support of her conclusions. Pl. Br. (doc. 12) at 10. I disagree

---

[1]     The Listing of Impairments is a regulatory device used to streamline benefits determinations by defining medical impairments that would prevent an adult, regardless of age, education, or work experience, from performing any gainful activity, not just substantial gainful activity. Sullivan v. Zebley, 493 U.S. 521, 532 (1990); 20 C.F.R. §§ 404.1525(a), 416.925(a).

[2]     A claimant's RFC reflects "the most [he] can still do [in a work setting] despite [his] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ found Evans could "perform a full range of work at all exertional levels but with the following nonexertional limitations: . . . no exposure to hazards including unprotected heights and moving machinery; . . . no more than frequent handling and fingering with the right dominant upper extremity[;] . . . routine tasks; . . . short and simple instructions; . . . simple work-related decisions with few workplace changes[;] . . . no interaction with the public; no work that is co-dependent/teamwork; and no more than occasional interaction with co-workers and supervisors." R. at 20.

and deny Evans's claim.[3]

The ALJ acknowledged Evans's significant functional limitations, but provided substantial evidence to support her conclusion that he retains the capacity to perform a limited range of work. She accurately reviewed: (1) Evans's reports; (2) the medical evidence; (3) medical opinions; and (4) Vocational Expert (VE) testimony. Her linchpin determination was that Evans's failure to follow through with recommended treatment showed his symptoms were less severe than he reported. The ALJ cited substantial evidence to support her decision. See Miller v. Comm'r of Soc. Sec., 719 F. App'x 130, 134 (3d Cir. 2017) (ALJs may discount subjective claims based on a claimant's failure to obtain treatment).

I. Consistency

The ALJ supported her conclusion that the record did "not fully corroborate the disabling severity of symptoms and degree of limitation" Evans alleged by noting: (1) his migraines were treated "routinely," with prescription medication; (2) his mental impairments "were treated with outpatient psychotherapy and medication management"; and (3) the "preponderance" of the record showed his impairments were "stable," according to his own reports and "the generally unremarkable physical and mental status examination findings." Id. She then reviewed his neurology records in detail, noting they were "not fully consistent with the claimant's reports of disabling migraine[s]." Id. at 21-22. She reviewed his mental health treatment records as well as the June 2015 psychiatric consultative examination. Id. at 22. She found that Evans's "mental health symptoms continued to remain stable with treatment." Id. at 23.

---

[3] Evans consented to my jurisdiction over this claim on October 10, 2018 (doc. 8), pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 72, Local Rule 72.1, and Standing Order, In re Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018).

Although the ALJ concluded that "severe medical conditions exist," she found that the "objective findings simply do not justify the disabling limitations that the claimant alleges in his testimony." Id. at 24. For example, she noted that the record repeatedly documented Evans's "lack of full compliance with his prescribed medication," and that, despite his allegations, he felt well enough to continue pursuing a carpentry certification. Id. She then reviewed the medical opinions, and concluded they supported Evans's ability to work within the confines of the RFC. Id. at 24-25. This analysis meets the legal requirements that the ALJ first accurately review the evidence, Carfaro v. Comm'r of Soc. Sec., No. 16-5227, 2018 WL 6190531, at *5 (E.D. Pa. Nov. 27, 2018), and then measure the claimant's subjective complaints against it, Hartman v. Comm'r of Soc. Sec., No. 17-3346, 2018 WL 7502407, at *12 (E.D. Pa. Dec. 18, 2018) (R&R adopted Feb. 28, 2019).

Evans relies on records of his 2014-15 treatment with Dr. Matta and his 2014 inpatient treatment to substantiate his report of paralyzing social anxiety, and dismisses the ALJ's analysis as based on merely his ability to "concentrate on intricate computer games." Pl. Br. at 26 (citing Exs. 6F and 15F). But this quote about computer games came directly from Evans's therapist, who doubted his self-reported inability to "concentrate" sufficiently to read the book she had assigned him. R. at 555. The therapist explained that Evans was nevertheless simultaneously "able to concentrate on intricate computer games" for extended periods of time. Id.

The ALJ accurately summarized the only records related to Evans's 2014 inpatient treatment that were produced, i.e., his admission from the emergency department. Id. at 22. Evans argues that records of his 2014 hospitalization show he experiences anger, mood swings, lack of energy, sleep difficulties, and suicidal ideations at home that are exacerbated in public. Pl. Br. at 26 (citing R. at 529). They show, however, that his suicidal crisis was precipitated by a

convergence of several factors: he had started getting paid less when his work slowed down, a close cousin had died a month earlier, and his girlfriend unexpectedly broke up with him on Valentine's Day. R. at 529. Evans stabbed himself in the thigh with a small knife, resulting in a 0.5 mm puncture wound that "did not require any medical intervention." Id. at 530, 532-33. His mother and uncle drove him to the emergency room. Id. at 532.

After his week of inpatient treatment, id. at 491, Evans began seeing Dr. Matta and a therapist at Lehigh Valley Health Network, id. at 553-65. Although Evans accurately noted that Dr. Matta described his concentration as "poor" during their visits in March and April of 2014, he omitted her other findings, namely that, even at their first meeting, Dr. Matta assessed him as having "fair" communication and social skills, "good" self-care skills, and a GAF score of 60.[4] Id. at 369. At their next few meetings, despite rating Evans's concentration as "poor," Dr. Matta described him as "stable" and repeatedly assigned him GAF scores of 60, noting she would not support his application for disability benefits because she believed he should be able to work shortly. Id. at 362, 364. Although Dr. Matta assigned Evans a slightly lower GAF score of 55 in March 2014, id. at 358, at their final meeting in April 2014 she bumped the score back up to 60, id. at 354. She also refused to assign him a new therapist because she believed he needed to "take responsibility" for his illness and do the work necessary to recover. Id.

Evans contends the ALJ unfairly noted his failure to take medication, explaining that his

---

[4] GAF scores (on a 100-point scale) reflect the mental health specialist's severity assessment on a particular day, and are based on the patient's state of mind and symptoms. Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV"). A GAF score of 51 to 60 indicates "[m]oderate symptoms . . . [or] moderate difficulty in social, occupational, or school functioning." Id. GAF scores have not been included in the most recent version of the DSM, published in 2013, due in part to their "conceptual lack of clarity" and lack of validity. DSM-V at 16.

anger issues and side effects from medication rendered him unable to comply with treatment. Pl. Br. at 27 (citing R. at 353, 569). But the anger described in the records did not prevent him from pursuing treatment. When Evans's therapist confronted him with his failure to follow through on reading the book for his cognitive behavioral therapy, Evans walked out. R. at 353. When his psychiatrist declined his request for a new therapist, instructing him instead to do the work required to recover, he left treatment with her as well. Id. He testified that he punched a hole in a wall during a session with another therapist in November 2015,[5] but Evans conceded he never tried an anger management program. Id. at 65-66.

Evans's reports of disabling medication side effects are not supported by the evidence. To the frustration of his treating psychiatrist, Evans repeatedly resisted taking medication, at one point refusing any prescription until he could obtain a test designed to find medications best suited to his genetic profile. Id. at 713 ("Both [Evans and his mother] say they are looking for directions from me but when I suggest something they do not want to try it."). After the testing was completed, however, and the psychiatrist found a medication that aligned with the test's recommendations, Evans "dispute[d] the gene testing that he insisted on getting done." Id. at 702. Once convinced to try a medication, Evans attributed psychiatric symptoms to side effects, id. at 695, 700, and failed to credit the medication with observable improvements, like better sleep, id. at 697, improved eye contact, and stronger speech, id. at 695, 697. Evans's statements that he could not take prescription medications because they produced overwhelming side effects and did not work, id. at 708 (Evans stopped taking his medications and professed to feel "just as good without them"), are contradicted by the symptoms his treating psychiatrist observed.

---

[5] I am unable to locate records corroborating this account.

Compare, e.g., id. at 704 with id. at 714-15.

Substantial evidence supports the ALJ's conclusion that Evans's subjective views of his symptoms were unreliable. Id. at 18 ("the record indicates generally that [Evans's] side effects are mild and would not interfere with [his] ability to perform work activities in any significant manner"). He saw a specialist for constipation, but testing showed a normal bowel transit time. Id. at 284. After a sleep study, he disputed the amount of time tests showed he had slept. Id. at 1115. Even Evans's function report was internally inconsistent. He described a daily routine that included videogames, reading, writing, and researching, but also claimed he no longer had the concentration to participate in anything other than a weekly card game. Id. at 248, 251.

Evans argues the ALJ mischaracterized the record. He provides a laundry list of care obtained from 2014 through 2017, arguing it disproves the ALJ's observation that he failed to follow through on treatment. Pl. Br. at 15-16. The ALJ addressed those records, however, and Evans has failed to show they were inaccurately summarized. See R. at 18 (citing Exs. 4F, 6F), 19 (citing Exs. 13F, 17F, 23F), 22 (citing Exs. 7F, 15F, 16F, 24F), 23 (citing Exs. 26F, 27F, 29F, 30F, 35F), 24 (citing Ex. 3F).[6]

Evans also criticized the ALJ's conclusion that he was able use his progressing coping skills to enjoy his class at Northampton Community College. Pl. Br. at 13. Although Evans testified he was unable to complete the course due to anxiety, the record shows he reported contemporaneously that he could not continue because his vocational counselor failed to

---

[6] Although the ALJ mistakenly cited Exhibit 32F once in her opinion, Pl. Br. at 13 (citing R. at 23), her summary accurately described Exhibit 30F. R. at 949. The only exhibit Evans lists that the ALJ did not discuss is 28F, the Consumer Health Inventory. Because it consists entirely of self-reported symptoms, the ALJ was not required to discuss it when explaining how the objective medical records were inconsistent with Evans's reports. See Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 204 (3d Cir. 2008).

6

communicate with him about accommodations. Id. at 923, 925. Further, as of February 2017, he planned to return to community college classes. Id. at 796.

Evans disputes the ALJ's conclusion that records from November 2016 through March 2017 show improvement and symptoms that "were not as severe as he . . . alleged." Pl. Br. at 13. He notes he took "Latuda, a heavy-duty psychiatric medication," and cites symptoms from December 2016. Id. at 14. Evans, however, took Latuda for only four months, during which time his psychiatrist specifically noted he was "not experiencing psychiatric symptoms." R. at 702, 700, 697, 695. He stopped the Latuda because his "family" wanted him to, and despite his psychiatrist's opinion that it was "medically necessary to continue" the prescription. Id. at 698.

Evans notes that his psychiatrist described March 22, 2017 as a "horrible day," and recorded several symptoms during the mental status exam. Pl. Br. at 14. Nevertheless, the psychiatrist also noted that Evans was "not experiencing psychiatric symptoms." R. at 689. Moreover, the "horrible day," which the ALJ specifically acknowledged, id. at 24, took place a month after Evans had insisted on switching medications, despite the prior medication's efficacy. Id. at 691.

Evans argues the Recovery Partnership records show he was incapable of functioning without "close contact with therapists." Pl. Br. at 14 (citing Exs. 27F, 29F, 30F). Those records show that Evans struggles with social interaction, and has been working with a peer counselor to speak more fluidly with strangers and make and maintain meaningful friendships, a skill set Evans needs to work on at least in part because he moved around so much as a child. See, e.g., R. at 834. But the same records Evans cites to show "going out of his home requires planning," and even "a written plan," demonstrate that he engaged in weekly games of Dungeons and Dragons or Magic as early as 2015, successfully participated in a skills development group in

7

March 2016, "achieved" his goal of interacting with strangers at a café in May 2016, and distributed fliers at a Mental Health Awareness Walk in 2017. Id. at 866, 868, 872, 888.

Recovery Partnership records also show that Evans was writing a novel as early as December 2014. Id. at 841. Although the program provided significant support, its focus was explicitly "whole health," not merely recovering the basic functionality required for jobs that accommodate Evans's limited RFC. Id. at 822. Evans and his counselor would, for example, meet over lunch or coffee to work on Evans's social skills and goals. Id. By February 2015, a year after his hospitalization, Evans had a "club" from which he had to leave early to take his cat to the veterinarian. Id. at 831. Although Evans displayed social limitations, the ALJ cited substantial evidence to support her determination that they were not extreme enough to support Evans's testimony that he could not function at all in social settings. Id. at 69.

Evans disputes the ALJ's assessment that he was "stable," arguing that she cited only two examples from late 2015 in reaching this conclusion. Pl. Br. at 17. But the ALJ concluded Evans was stable "with treatment," R. at 23, which the medical records support, see id. at 499 ("good" response to psychiatric treatment in 2012), 522 (was able to obtain a job while on psychiatric medication), 718 (showing improved eye contact and mood on medication, even though he "report[ed] no improvement").

Evans also cites to a GAF score of 45 to counter the ALJ's stability conclusion.[7] Pl. Br. at 17. The ALJ cited the page with this score in her opinion. R. at 23 (citing id. at 802). She reasonably explained that she gave GAF scores little weight because a GAF score is "only a snapshot," and "can be influenced by many considerations, such as legal, housing, or financial

---

[7] A GAF score in the range of 41 to 50 indicates "[s]erious symptoms . . . [or] any serious impairment in social, occupational, or school functioning." DSM-IV at 34.

problems, which are not properly part of the disability analysis." Id. at 25. She also sufficiently explained how the other evidence reasonably supported her conclusion that Evans's condition was stable with treatment by showing that Evans's periods of most limited functionality occurred when he failed to see a psychiatrist or take any medication. Id. at 23 (citing id. at 802).

Evans contends the records reflect disabling symptoms because, at one point during his treatment, he raised the possibility of entering a residential facility. Pl. Br. at 17 (citing R. at 719). This discussion, however, took place after Evans's car broke down around Thanksgiving, just a month after he had re-entered psychiatric care. Id. at 716. When he continued to take medication as prescribed, his symptoms improved. Id. at 717.

Evans also criticizes the ALJ's treatment of consultative examiner Dr. Coleman, arguing that Dr. Coleman had not reviewed Evans's records and that his assessment was a one-time snapshot of Evans's symptoms on that date. Pl. Br. at 26-27. The ALJ afforded Dr. Coleman's opinion "great weight" because she found it "consistent with the record as a whole, which documents an improvement in [Evans's] mental health with his prescribed course of outpatient treatment." R. at 24. The record shows that Evans's mental health symptoms improved when he took prescribed medication, id. at 695, 697, 710, 712, or followed the advice of his counselors, id. at 888. It failed to improve when he rejected, id. at 705, 707, or failed to follow through with, id. at 518, 778, recommended treatment. The ALJ set forth substantial evidence to support her assertion that Evans's mental health improved when he followed his prescribed course of treatment, and thereby provided substantial evidence to support giving "great weight" to Dr. Coleman's opinion. Id. at 24.

The ALJ set forth substantial evidence that Evans's severity allegations were inconsistent with his treatment records. 20 C.F.R. §§ 404.1529(a), 416.929(a) (ALJs must evaluate the

9

severity and persistence of reported symptoms in light of "all of the available evidence"); see also Minch v. Comm'r of Soc. Sec., 715 F. App'x 153, 157 (3d Cir. 2017) (upholding ALJ determination that claimant's mental impairment was not severe when, after 10 days of inpatient care precipitated by losing custody of his daughter, he was stable with psychiatric treatment).

  II.   Listings

   1.  12.04 and 12.06

The ALJ found Evans failed to meet Listings 12.04 and 12.06 based on the B and C criteria. R. at 19-20. She found Evans exhibited no more than moderate limitations in any of the four functional areas addressed in the B Criteria, and did not meet the C criteria because he did not establish he had "a minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life." Id.

Evans argues he meets the B criteria because he is "markedly," not "moderately," limited in interacting with others and concentrating, persisting, or maintaining pace. Pl. Br. at 11. He also contests the ALJ's conclusion that he suffers only "mild" limitations in adapting or managing himself. Id. He contends he meets the C criteria because he lives in a highly structured living environment and has an only marginal ability to adapt. Id. at 20-21.

   i.   B Criteria: Understanding, Remembering, or Applying Information

The ALJ explained that she found Evans suffered only a mild limitation in the functional area of understanding, remembering, or applying information because his therapists had found him attentive, interested, and cooperative, with intact concentration. R. at 20-21. Further, during his June 2015 consultative evaluation, Evans's "thought process was coherent and goal-directed with no evidence of hallucinations, delusions, or paranoia." Id. Finally, she noted Evans's admissions that he could "perform household chores such as preparing meals, doing the laundry,

10

washing dishes, and taking out the trash." Id.

Evans suggests the ALJ should have given more weight to the opinion of Dr. Machowsky, Evans's former provider who found him "markedly" limited in his ability to make complex judgments, interact appropriately with co-workers, and adapt to changes in a work setting. Pl. Br. at 20 (citing R. at 288-89). But Dr. Machowsky also found Evans was only mildly limited in his ability to understand, remember, carry out simple instructions, and interact with the public. R. at 288-89. Dr. Matta, who Evans also suggests had a better grasp on his abilities than Dr. Coleman, refused to support Evans's disability application because she believed he could work. Id. at 362. The ALJ supported her conclusion with substantial evidence.

    ii.        B Criteria: Concentration, Persistence, or Pace

The ALJ acknowledged Evans's reported difficulty concentrating, but noted: (1) "he is able to perform a variety of multistep tasks, such as driving a car, paying bills, counting change, handling a savings account, using a checkbook, and following spoken and written directions"; and (2) "mental status examination findings from 2013 through 2015 show his concentration was intact." Id. at 20.

Evans disputes the ALJ's conclusion by citing his own function reports and self-reports to his primary care physician, Pl. Br. at 19, but the ALJ provided substantial evidence to discount this evidence, see § II, supra. Moreover, as the ALJ and Evans's therapist noted, Evans maintains adequate concentration to perform even challenging tasks that interest him. R. at 555. He testified that he is developing a videogame, id. at 49, and reported he was writing a book, id. at 849. The ALJ provided substantial evidence that he suffers only moderate limitations in concentration, persistence, or pace and Evans failed to refute her conclusion.

### iii. B Criteria: Social Interactions

With respect to the moderate limitation in interacting with others, the ALJ noted: (1) Evans "reported that he spends times with others"; (2) "has never been laid off from work because of problems getting along with other people"; and (3) "is able to get along with authority figures." She also acknowledged that he "continues to require outpatient mental health treatment for depression and anxiety." Id. at 20.

Evans's functioning is most limited in the social area, and Evans contends the limitation is "marked." Pl. Br. at 11. He relies largely on the Recovery Partnership records to corroborate his self-reports of paralyzing social anxiety. Id. The ALJ conceded the records show Evans's social struggles, R. at 21-22, but supported her decision to discredit the severity of his subjective allegations with substantial evidence, see § II, supra. She also supported her determination that he suffered only "moderate" limitations with substantial evidence. R. at 20. Even if Evans's social limitations are marked, however, the ALJ's error is harmless, because Evans would have had to establish a marked limitation in two functional areas to satisfy the B criteria. 20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 12.04B, 12.06B; see also Shinseki v. Sanders, 556 U.S. 396, 409 (2009).

### iv. B Criteria: Adapting or Managing Himself

Finally, the ALJ supported her conclusion that Evans suffers only mild limitations in adapting or managing himself by noting the following findings in his mental health assessments and examinations: he was cooperative, interested, attentive, had adequate social skills, was appropriately dressed, had normal motor behavior and appropriate eye contact, coherent and goal-direct thought process and no evidence of hallucinations, delusions, or paranoia. R. at 21. She also noted that no state agency psychological consultant had found Evans's limitations

medically equaled a Listing. Id.

Evans argues this assessment fails to account for "his periods of dissociation, debilitating headaches, and anxiety attacks that have rendered him unable to communicate with others." Pl. Br. at 12. The ALJ addressed the evidence of headaches and mental health symptoms, but rejected Evans's assessment of their severity. R. at 22-24. Evans argues he cannot manage himself because he is not independent; his mother attends his doctors appointments with him and he reported that she reminds him about his hygiene, medication regimens, and money issues. Pl. Br. at 20. But Evans moved in with his mother after experiencing financial distress due to his student loans, R. at 693, 697, 699, 702, and there is no evidence that he has any hygiene issues, see, e.g., id. at 489 ("well-groomed"), 720 ("appropriate appearance"). Moreover, although Evans may prefer to have his mother at his appointments, especially when he is refusing to follow recommended treatment, he never required her presence with Recovery Partnership counselors. Id. at 804-11, 856-1084. The ALJ supported her functional assessment with substantial evidence.

    v.    C Criteria

Evans contends that, because he lives with his mother and sees a therapist, psychiatrist, peer support counselor, and intensive case manager, he effectively lives in a "structured setting." Pl. Br. at 12, and has only marginal adjustment abilities, id. at 21. The ALJ did not address whether Evans lives in a "structured setting," but concluded that "[t]he record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life." R. at 20. Because Evans must prove both that he lives in a structured setting and that he is capable of only marginal adjustment to meet the C criteria, 20 C.F.R. Pt. 404, Subpt. P., App. 1,

13

§§ 12.04C, 12.06C, the ALJ had substantial evidence to conclude he does not meet the C criteria based on his inability to prove marginal adjustment abilities.

Evans cites his own function report and the difficulties he reported to his peer counselor as evidence he is unable to adjust to change. Pl. Br. at 21. As discussed above, however, the ALJ presented substantial evidence to discount his subjective claims. See § II, supra. With respect to the Recovery Partnership records, Evans argues they support a finding that he is capable of only marginal adjustment because they show him struggling with socializing during large public events and making phone calls. Pl. Br. at 21. But those same records also show him overcoming many of these same challenges, and do not undermine his demonstrated ability to socialize in smaller, familiar settings and incrementally expand his social circles. R. at 866, 868, 872, 888. Accordingly, the ALJ set forth substantial evidence to support her conclusion that Evans was capable of more than marginal adjustment, id. at 19-20, and I may not re-weigh the evidence to reach the opposite conclusion, Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011). Because either mental health listing would have required Evans to establish A criteria and either B or C criteria, 20 C.F.R. Pt. 404, App. 1, §§ 12.04, 12.06, Evans has failed to undermine the ALJ's conclusion that he did not meet a mental health listing.

2. 11.03

Evans argues the ALJ erred by finding his migraine headaches did not medically equal the requirements of Listing 11.03 because he documented that they rendered him incapable of working multiple times per week. Pl. Br. at 22-25. He acknowledges, however, that reaching this conclusion requires crediting his allegations. Id. at 24 ("If he is credible, this is also sufficient for a finding that he 'equals' the Listing.").

The ALJ did not find Evans's allegations as to the severity of his symptoms credible, and

14

reviewed his neurology records in detail. R. at 21-22. She noted that physical examinations and exams revealed "essentially benign findings," that various treatments appeared to relieve his pain, that he acknowledged the headaches were caused by stress, and that he was ultimately instructed to continue taking his medication and drink water. Id. at 22. Contrary to Evans's allegations, the records show medications usually provided relief quickly. Id. at 726-29. Effective treatments included both Naproxen and Topamax, id. at 738, as well as Ibuprofen, id. at 1103, 1108. Even untreated, his headaches only sometimes required him to retreat to a darkened room, and could be prevented by obtaining adequate sleep. Id. at 726. The ALJ supported her conclusion with substantial evidence that Evans failed to refute.

III. RFC

Finally,[8] Evans argues the ALJ failed to support her RFC with substantial evidence because the VE failed to include all his limitations when she testified he could perform jobs in the national economy. Pl. Br. at 28-29. The ALJ, however, is not required to submit to the VE claimed limitations that have been "reasonably discounted" because they are: (1) not supported by objective medical evidence; (2) contradicted by the claimant's medical records; or (3) contradicted by the claimant's own testimony. See Rutherford v. Barnhart, 399 F.3d 546, 554-56 (3d Cir. 2005). As discussed above, the ALJ accurately summarized the evidence and Evans failed to undermine her conclusions. Because the ALJ supported her RFC with substantial evidence and her hypothetical to the VE accurately reflected those limitations, she reasonably

---

[8] In his Reply, Evans suggests for the first time that the ALJ violated his right to due process by limiting testimony during his hearing. See Reply (doc. 14) at 9-10. This issue was not properly raised and is therefore waived. Yots v. Comm'r of Soc. Sec., 704 F. App'x 95, 99 n.13 (3d Cir. 2017) (citing Anspach v. City of Philadelphia, Dept. of Public Health, 503 F.3d 237, 246 (3d Cir. 2002) (issues raised for the first time in a Reply brief are waived)).

relied on VE testimony to support her conclusion that Evans was not disabled. See SSR 85-15, 1985 WL 56857, at *3 (VE testimony can provide substantial evidence for RFCs with non-exertional limitations).

      An appropriate Order accompanies this opinion.